IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 11-_____ |
| | § | |
| IRWIN MORTGAGE CORPORATION, | § | |
| | § | |
| | § | Chapter 11 |
| | § | Judge _____ |
| Debtor and | § | |
| Debtor-in-Possession. | § | |
| | § | |

## DECLARATION OF FRED C. CARUSO IN SUPPORT OF FIRST DAY PLEADINGS

Fred C. Caruso declares in accordance with 28 U.S.C §1746, as follows:

1. I am a Director and the President and Chief Restructuring Officer of Irwin Mortgage Corporation ("IMC" and/or the "Debtor" and/or the "Company"), which is the debtor and debtor-in-possession in the above-captioned case. Further, I am the Vice President and Chief Operating Officer of Development Specialists, Inc. ("DSI"), a national turnaround and consulting firm. I am also a Certified Public Accountant and a Certified Insolvency and Restructuring Advisor.

2. I am authorized to submit this Declaration on behalf of the Debtor.

3. As a result of my engagement by the Debtor in October, 2010, and the investigation by myself and other professionals from DSI, I am familiar with the Debtor's business affairs. Further, except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, the investigation conducted by myself and other members of DSI, my review of relevant documents, my discussions with the Debtor's professionals, or my

677504.1

opinion, based on my experience and knowledge of the Debtor's business affairs and financial condition. If called as a witness, I would testify competently thereto.

4. To better enable the Debtor to prosecute this Chapter 11 Case (as defined below) quickly and efficiently and in order maximize the value for creditors, the Debtor intends to request various types of relief in "first day" applications and motions (collectively, the "First Day Pleadings"). I submit this Declaration in support of the Debtor's First Day Pleadings.[1] Capitalized terms used in this Declaration without definition shall have the meanings attributed to them in the specific First Day Pleading.

5. Section I of this Declaration describes the Debtor and the circumstances surrounding the commencement of the Chapter 11 Case (as defined below). Section II of this Declaration sets forth the facts in support of the First Day Pleadings.

## SECTION I –

### DESCRIPTION OF DEBTOR AND CIRCUMSTANCES SURROUNDING COMMENCEMENT OF THE CHAPTER 11 CASE

**A.** **The Debtor's Chapter 11 Filing.**

6. On July 8, 2011 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 (the "Chapter 11 Case") of title 11 of the United States Code, 11 U.S.C. §§ 1010-1532, as then amended (the "Bankruptcy Code"). The Debtor continues to manage its business and its properties as a debtor-in-possession under Bankruptcy Code sections 1107(a) and 1108.

7. No creditors' committee has yet been appointed in this case by the United States Trustee. No trustee or examiner has been appointed in the Chapter 11 Case.

## B. Background Information / IMC's Business Operations Prior to Wind Down / The FDIC Transaction.

8. IMC is an Indiana corporation. Its principal place of business is, and has been for more than 180 days preceding the Petition Date, located at 6375 Riverside Drive, Suite 200, Dublin, Ohio.

9. For a number of years, IMC originated, purchased, sold and serviced conventional and government backed residential mortgage loans throughout the United States. However, in 2006 and continuing into early 2007, IMC sold substantially all of its assets, including its mortgage origination business, its mortgage servicing business, and its mortgage servicing rights portfolio, to a number of third party purchasers. As a result of those sales, IMC terminated operations and began its wind down in 2006.

10. At the time IMC sold its assets, terminated its operations and commenced its wind down, IMC was a subsidiary of Irwin Union Bank and Trust Company ("IUBT"). IMC remained a subsidiary of IUBT until IUBT was closed by Indiana bank regulators on September 18, 2009 and the Federal Deposit Insurance Company (the "FDIC") was appointed receiver of IUBT (the "IUBT Failure"). IUBT's parent corporation, Irwin Financial Corporation, also filed for relief under chapter 7 of the Bankruptcy Code on September 18, 2009 in the United States Bankruptcy Court for the Southern District of Indiana, Indianapolis Division, Case No. 09-13852-FJO-71, captioned <u>In re: Irwin Financial Corporation</u> (the "IFC Bankruptcy").

11. Following the IUBT Failure, First Financial Bank, National Association ("FFB") acquired certain assets of IUBT from the FDIC, including the stock of IMC, in accordance with the Purchase And Assumption Agreement between the FDIC and FFB (the "FDIC Transaction").

---

[1] The First Day Pleadings refer to this Declaration as the "Caruso Declaration."

3

677504.1

12. Once FFB acquired the IMC stock as a part of the FDIC Transaction, new directors and officers were appointed. In October, 2010 IMC engaged DSI to assist IMC with the completion of the wind down commenced in 2006 under prior ownership. DSI is a national turnaround and consulting firm which specializes in crisis, interim and wind down management. DSI's engagement contemplated that DSI would: (i) provide professional staff to serve as directors and/or officers of IMC; (ii) review and assess IMC's financial position in order to aid in the preparation of an orderly wind down plan that maximizes the value of IMC and addresses the resolution of pending claims against IMC; (iii) represent IMC in the course of the wind down; (iv) advise IMC with respect to claims resolutions and asset dispositions; and, if necessary, (v) assist IMC with the planning and filing of a bankruptcy case.

13. In connection with DSI's engagement, I have served as a Director of IMC and as IMC's President and Chief Restructuring Officer. Mr. George E. Shoup, III, another DSI professional, has served as IMC's Assistant Chief Restructuring Officer. Mr. Shoup and I have been managing IMC's affairs since our appointment. IMC has no employees.

14. Shortly after IMC's engagement of DSI, Margaret M. Good was also appointed as a Director of IMC. Ms. Good has over 25 years experience in management consulting and corporate finance and is the president of the Meridian Group, a Pittsburgh based turnaround consulting firm.

**C.     Irwin Reinsurance Corporation ("IRC").**

15. As a part of the FDIC Transaction, IMC retained its ownership of IRC, a regulated, captive reinsurance subsidiary organized under the laws of the State of Vermont. As a captive reinsurance company, IRC is regulated by the Vermont Commissioner of Banking,

4

Insurance, Securities and Health Care Administration ("BISHCA"). IRC is not a debtor. I also serve as a director and officer of IRC.

16. On June 2, 2011, BISHCA approved a dividend by IRC in the amount of $3.8 million (i.e the First IRC Dividend as defined below) as well additional dividend(s) in the amount(s) equal to the future increases in IRC's unrestricted cash (i.e. the Second IRC Dividend as defined below).

17. The IRC Board of Directors approved a dividend to IMC in the amount of $3.8 million (the "First IRC Dividend") by Directors' Unanimous Consent, as of June 3, 2011. On June 28, 2011 IRC issued the First IRC Dividend by wire transfers. A portion of the First IRC Dividend in the amount of $1,204,555.56 was wired directly to FFB as payment of the FFB Secured Facility (as defined below). The balance of the First IRC Dividend in the amount of $2,595,444.44 was wired to IMC.

18. The IRC Board of Directors approved an additional dividend to IMC in the amount of $3,010,000.00 (the "Second IRC Dividend") by Directors' Unanimous Written Consent, as of June 29, 2011. On June 30, 2011 IRC issued a wire transfer to IMC in the amount of the Second IRC Dividend.

**D.     Pre-Petition Equity and Capital Structures.**

19. As more fully set forth above, FFB acquired, and currently owns, 100% of IMC's stock as a result of the FDIC Transaction in September, 2009. IMC owns 100% of the stock of IRC.

20. From the FDIC Transaction in September, 2009 through the establishment of the FFB Secured Facility in February, 2011, FFB provided unsecured, inter-company net advances to IMC in the aggregate, approximate amount of $2.378 million in order to fund IMC's operations.

21. In February, 2011 IMC entered into a secured lending facility with FFB (the "FFB Secured Facility") pursuant to which FFB could loan IMC up to $3,025,000 to fund IMC's wind down. The indebtedness under the FFB Secured Facility was secured by liens and security interests on IMC's property and the pledge of IMC's stock in IRC.

22. IMC drew a total of $1.2 million under the FFB Secured Facility.

23. On June 24, 2011 FFB declared a default under the FFB Secured Facility. As noted above, on June 28, 2011 a portion of the First IRC Dividend was paid directly to FFB, in payment of the FFB Secured Facility.

24. As of the Petition Date, there are no amounts due under the FFB Secured Facility.

**E.     Events Leading to the Chapter 11 Filing.**

25. Commencing in 2006, substantially all of IMC's assets were sold to third party purchasers. Thereafter, IMC began a wind down of its operations. IMC's wind down continued under prior ownership for almost three (3) years until the IUBT Failure.

26. On or about September 18, 2009, FFB acquired the stock of IMC as part of the FDIC Transaction.

27. IMC engaged DSI effective August 24, 2010, to assist with the completion of the wind down. Thereafter, Ms. Good, an experienced insolvency professional, was also appointed to the IMC Board.

28. The IMC Board reviewed various alternatives available to the Board with respect to the completion of IMC's wind down, which had been commenced in 2006 under prior

6

ownership. On June 30, 2011 the IMC Board resolved that an orderly liquidation of IMC should be implemented through a Chapter 11 bankruptcy filing. A Chapter 11 filing (a) affords national jurisdiction to effectively and efficiently manage the numerous claims against IMC, many of which are pending in state and federal courts around the country; and (b) allows IMC to proceed as a debtor in possession with experienced and knowledgeable management to assist with the liquidation and the claims administration.

## SECTION II-
## DECLARATIONS IN SUPPORT OF THE FIRST DAY PLEADINGS

**29.** The Debtor filed First Day Pleadings and respectfully requests that the Court consider entering orders granting such First Day Pleadings. I have reviewed each of the First Day Pleadings (including the exhibits thereto) and can attest to the truth of the facts set forth therein. Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enable the Debtor to make the transition to chapter 11 with a minimum of interruption or expense and (b) constitutes an essential element in achieving the Debtor's orderly liquidation.

677504.1

## A. First Day Pleadings Requesting Approval of Administrative Matters.

### Debtor's Motion For Extension Of Time To File Schedules And Statements
### (the "Schedule and Statement Extension Motion")

30. The Debtor is requesting an extension until August 4, 2011 to file (a) a schedule of assets and liabilities, (b) a statement of financial affairs, (c) a statement of executory contracts and unexpired leases, and (d) a list of equity security holders required by Bankruptcy Rule 1007(b) (collectively, the "Schedules and Statements"). See the Schedule and Statement Extension Motion.

31. I am advised that pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, if the bankruptcy petition is accompanied by a list of all the debtor's creditors and their addresses, a debtor is required, within 14 days from the Petition Date, to file the Schedules and Statement.

32. While the Debtor has commenced the task of gathering the necessary information to prepare and finalize the Schedules and Statements, the Debtor believes that the fourteen day automatic extension of time to file such Schedules and Statements provided by Bankruptcy Rule 1007(c) may not be sufficient to permit completion of the Schedules and Statements.

33. For the foregoing reasons, a short, approximate two week additional extension, establishing August 4, 2011 as the date on or before which the Debtor must file its Schedules and Statements would provide sufficient time to prepare the Schedules and Statements without diverting critical resources in the early stages of the Chapter 11 Case.

677504.1

**Debtor's Motion For An Order Approving The Case Management Procedures
(the "Case Management Procedures Motion")**

34. The Debtor is requesting that the Court approve the Case Management Procedures, either sua sponte or after a hearing. See the Case Management Procedures Motion.

35. The Case Management Procedures, if approved, will establish certain notice, scheduling, case management, service and administrative procedures.

36. I have been advised that the Case Management Procedures will reduce the burden, complication, delay and costs associated with the administration of the Chapter 11 Case and yet provide adequate notice to creditors. I believe that the relief requested in the Case Management Procedures Motion is critical to the efficient administration of the Chapter 11 Case.

37. The Case Management Procedures will be distributed by the Debtor to the parties on the General Service List. The Case Management Procedures will also be available from Debtor's counsel and will be included on the website of KCC (as defined below) at: www.kccllc.com.

**Debtor's Ex Parte Motion For An Order Convening Hearing On First Day Pleadings
(the "Scheduling Motion")**

38. The Debtor has requested a hearing on the First Day Pleadings at least twenty-six (26) days after the Petition Date. See the Scheduling Motion.

39. The First Day Pleadings involve matters typically heard by bankruptcy courts early in a case and are essential first steps in the efficient commencement of this Chapter 11 Case.

40. With the exception of the Lease Rejection Motion, the Debtor is not requesting a shortened objection period or expedited consideration of the First Day Pleadings. Therefore, the

Debtor requests that the First Day Pleadings be considered approximately twenty-six (26) days after the Petition Date.

**Debtor's Motion For Waiver Of Compliance With LBR 9013-2 In Connection With Debtor's First Day Pleadings
(the "LBR 9013-2 Waiver Motion)**

41.  The Debtor is requesting an order waiving its compliance with the limitations set forth in LBR 9013-2 with respect to the First Day Pleadings. See the Debtor's LBR 9013-2 Waiver Motion.

42.  To the extent applicable, the Debtor requests a waiver of the twenty (20) page limitation and associated requirements concerning a table of contents and a summary. Although the Debtor will attempt to submit pleadings within the twenty page limit, if that is not possible, the Debtor requests a waiver of the limitation and related matters.

43.  Further, the Debtor requests a waiver of the requirement that it provide copies of all unreported orders and decisions to all parties. The citations included within the First Day Pleadings represent well established propositions of law. Further, the Debtor can provide copies to the Court or any interested party upon request to Debtor's counsel.

**B.   First Day Pleadings Requesting Approval Of Operational Matters.**

**Debtor's Motion For An Order Waiving The Trustee Guidelines And The Section 345 Guidelines
(the "Guidelines Waiver Motion")**

44.  The Debtor has requested a waiver of certain provisions of the U.S. Trustee Guidelines and the Section 345 Guidelines. See the Guidelines Waiver Motion.

45.  Prior to the Petition date, the Debtor maintained a checking account at FFB (the "Pre-Petition Account"). The Debtor is closing the Pre-Petition Account and opening a new "DIP" checking and savings accounts with Huntington Bank (the "DIP Bank"), an approved depository bank with the United States Trustee for Region 9.

46. However, the Debtor requests a waiver of certain other of the United States Trustee's requirements, including that separate debtor in possession cash collateral, payroll and tax accounts be established.

47. The Debtor's operations have ceased. There are no employees and no outstanding secured indebtedness. Accordingly, the Debtor's bank account requirements are simple. The Debtor's operations have been, and can continue to be, managed out of a single operating account. There is no "cash collateral" so there is no need for a cash collateral account. Further, there are no employees so there is no need for a payroll account. Finally, there are no ongoing operations so there is no need for a tax account. Moreover, opening these additional, unnecessary accounts will be time consuming and expensive and will not provide any benefit to the estate, the Court, the U.S. Trustee or the creditors.

48. It appears from the U.S. Trustee's website that, as of March 8, 2011, the DIP Bank was an approved depository bank under the Region 9 guidelines and the Debtor's use of the account at the Depository Bank will substantially conform with the approved investment practices identified in section 345 of the Bankruptcy Code.

**Application Of Debtor Pursuant To Fed. R. Bankr. P. 2014(A) For An Order Under Section 327(A) Of The Bankruptcy Code Authorizing The Employment And Retention Of Bailey Cavalieri LLC Nunc Pro Tunc As Counsel For The Debtor And Debtor In Possession
(the "BC Employment Application")**

49. The Debtor seeks authorization to employ and retain Bailey Cavalieri, LLC ("BC") as general bankruptcy counsel in the Chapter 11 Case and all related matters. See the BC Employment Application.

50. Prior to commencement of the Debtor's Chapter 11 Case, the Debtor sought the services of BC with respect to, among other things, advice regarding wind down matters in general and preparation for potential filing of the Chapter 11 Case. In this regard, BC

has performed extensive legal work for the Debtor in connection with its ongoing wind down efforts. As a result of representing the Debtor on such matters, BC has acquired extensive knowledge of the Debtor and its assets and liabilities and is familiar with the Debtor's capital structure, corporate structure, financing documents and other material agreements.

51. I believe that the Debtor's continued representation by its pre-petition restructuring and bankruptcy counsel, BC, is critical to the Debtor's efficient liquidation because BC is extremely familiar with the Debtor's business and legal and financial affairs and, accordingly, is well suited to guide the Debtor through the chapter 11 process. Furthermore, BC has substantial experience and knowledge in the field of debtors' and creditors' rights and business reorganizations and liquidations under chapter 11 of the Bankruptcy Code.

**Motion Of Debtor For An Interim And Final Order Authorizing The Continued Use Of Development Specialists, Inc. To Provide Wind Down Management**
**(the "DSI Application")**

52. The Debtor seeks authorization to employ and retain DSI as wind down management for the Debtor, including me as a Director and as President and Chief Restructuring Officer and Mr. Shoup as Assistant Chief Restructuring Officer. See the DSI Application.

53. The Debtor seeks to retain DSI as wind down management because, among other things, DSI and its professionals have substantial experience providing services to debtors in bankruptcy matters. DSI is a national turnaround management firm and specializes in assisting and advising companies in need of financial and operational turnaround and workout assistance, both in and out of court. DSI's services have included developing plans of liquidation, claims determination and related matters, testifying before bankruptcy courts and other relevant matters.

54. Further, since DSI's engagement, it has become well-acquainted with the Debtor's financial circumstances, assets, liabilities, claims and related matters. Accordingly,

DSI has developed significant relevant experience and expertise regarding the Debtor that will assist it in providing effective and efficient services in the Chapter 11 Case.

**Debtor's Application For An Order (A) Authorizing The Debtor To Mail All Notices And (B) Approving The Agreement With Kurtzman Carson Consultants LLC As Claims, Noticing And Solicitation Agent
(the "KCC Application")**

55. The Debtor seeks authorization to employ and retain Kurtzman Carson Consultants LLC ("KCC") to provide consulting services regarding noticing, claims management and reconciliation, plan solicitation, balloting, disbursements and any other services agreed upon by the parties or required by applicable law or court order. See the KCC Application.

56. Debtor's counsel has advised me that pursuant to Bankruptcy Rule 1007(a)(1) and Local Rule 1007-2, a chapter 11 petition for relief is to be accompanied by a list of parties in interest (the "Mailing Matrix") in a computer readable format designed and published from time to time by the clerk of the Court (the "Clerk"). I am further advised that pursuant to Bankruptcy Rule 2002, the Clerk, or some other person as the Court may direct, is required to provide various notices to creditors, equity security holders, the United States and the United States Trustee.

57. The Debtor respectfully submits that the most effective and efficient manner by which to accomplish the process of photocopying and transmitting notices is to authorize the Debtor or an independent third party to act as an authorized noticing agent of the Court.

58. The Debtor also respectfully requests that it will not be required to serve notice by U.S. Mail on parties in interest which have registered for participation in electronic case filing, including, but not limited to, notice pursuant to Bankruptcy Rule 2002(a), except as otherwise ordered by the Court.

13

59. I have been advised that the Court may direct that some person other than the Clerk give notice to parties in interest. Accordingly, the Debtor seeks authorization to employ KCC as the Debtors' claims, noticing, and solicitation agent (the "Claims Agent") in connection with the Debtor's Chapter 11 Case pursuant to the terms in the KCC Engagement Application.

60. KCC has substantial experience performing noticing, claims and solicitation services for chapter 11 debtors.

**Debtor's Motion For An Order Authorizing The Employment And Compensation Of Ordinary Course Professionals
(the "Ordinary Course Professionals Motion")**

61. The Debtor requests authority to employ and compensate Ordinary Course Professionals. See the Ordinary Course Professionals Motion.

62. The Debtor regularly calls upon various professionals, including attorneys, to assist the Debtor with respect to matters which are unrelated to the Chapter 11 Case. The Debtor anticipates employing these Ordinary Course Professionals during the pendency of the Chapter 11 Case to render services that are similar to those rendered before the Petition Date. The Ordinary Course Professionals will not be involved in the administration of the Chapter 11 Case.

63. Given the number of Ordinary Course Professionals, it would be prohibitively costly, time consuming and administratively cumbersome to require each Ordinary Course Professional to apply separately for approval of their employment and compensation.

64. In this regard, the Debtor respectfully requests permission to pay, without formal application to the Court, one-hundred percent (100%) of the interim fees and disbursements to each of the Ordinary Course Professionals in accordance with the procedures set forth in the Ordinary Course Professional Motion. The Debtor expects that the fees and

disbursements with respect to each individual Ordinary Course Professional will not exceed a total of $20,000 per month.

66. In the event that payments to any Ordinary Course Professional exceed $20,000 in any one month or $100,000 for the entire case, then payment of such Ordinary Course Professional's fees and expenses will be on an interim basis and remain subject to Court approval pursuant to a final application for an allowance of compensation and reimbursement of expenses under sections 330 and 331 of the Bankruptcy Code, to be filed by the Ordinary Course Professional.

66. The Debtor also respectfully requests permission to employ and retain Additional Ordinary Course Professionals as necessary, in the ordinary course of their business in accordance with the procedures in the Ordinary Course Professional Motion and without the need for any further hearing or notice to any other party, by filing with the Court the supplemental document discussed in the Debtor's motion.

67. If the Debtor loses the expertise, experience and institutional knowledge of these Ordinary Course Professionals, the estate could incur significant and unnecessary expenses, as the Debtor will be forced to retain other professionals without similar background and expertise. Therefore, it is in the best interests of the Debtor's estate to avoid any disruption in the professional services required by the Debtor on a day-to-day basis. Furthermore, although many of the Ordinary Course Professionals with whom the Debtor has previously dealt wish to represent Debtor on an ongoing basis, many might be unwilling to provide continued representation if payment is available only through a formal application process. Consequently, retention of the Ordinary Course Professionals and the payment of interim compensation according to those terms in effect prior to the Petition Date are in the best interests of the estate.

**Debtor's Motion For An Order Establishing Procedures For The Interim Compensation And Reimbursement Of Expenses Of The Professionals
(the "Interim Compensation Procedures Motion")**

68. The Debtor will seek to retain bankruptcy counsel and other professionals during the Chapter 11 Case. The Debtor also anticipates that any statutory committee of unsecured creditors that may be appointed may also seek to retain counsel and other professionals.

69. The Debtor requests that the Court authorize and establish procedures for the compensation and reimbursement of court-approved Professionals on a monthly basis, on terms comparable to those procedures recently established in other chapter 11 cases in this District. See the Debtor's Interim Compensation Procedures Motion.

70. Such an order will streamline the professional compensation process and enable the Court and all other parties to monitor the professional fees incurred in the Chapter 11 Case more effectively.

71. In general, the proposed procedures will permit each Professional to present a monthly statement of services rendered and expenses incurred. If there is no timely objection, after notice to specified interested parties, the Debtor will pay 85% of the amount of fees incurred (with a 15% holdback) and 100% of disbursements for each month. These payments will be subject to the Court's subsequent approval as part of the normal interim fee applicable process occurring every 4 months.

677504.1

**Debtor's Motion For An Order Rejecting The Fishers Leases**
**(the "Lease Rejection Motion")**

72. The Debtor has requested that the Fishers Leases be rejected, effective June 30, 2011. See the Lease Rejection Motion.

73. As more fully set forth in the Lease Rejection Motion, the Debtor is the lessee of the Fishers Building in accordance with the Fishers Prime Lease. The Fishers Building is a multi-story office building containing approximately 125,000 square feet, located at 10500 Kincaid Dr., Fishers, Indiana.

74. Further, the Debtor is a sub-lessor of portions of the Fishers Building in accordance with the Fishers Subleases.

75. The Fishers Building is not necessary to the Debtor and the Debtor surrendered the premises to Lantern Partners LLC ("Lantern"), the lessor under the Fishers Prime Lease, on June 30, 2011.

76. The Fishers Leases generate a net negative monthly cash flow of approximately $30,000 per month, exclusive of additional lease obligations to pay real estate taxes in the amount of approximately $370,000 per year. The Fishers Leases do not provide any benefit to the Debtor, its estate or its creditors. Further, the Debtor does not believe that there is any potential value in the Fishers Leases to be realized through a possible sale, assumption and assignment.

77. In the event that the Court enters a final, non-appealable order approving the rejection of the Fishers Leases effective June 30, 2011, the Debtor proposes that any payments received by IMC from the Fishers Subleases on account of the periods after June 30, 2011 (whether received by IMC before or after June 30, 2011) be paid to Lantern.

**Debtor's *Ex Parte* Motion Of Irwin Mortgage Corporation For An Order Convening Expedited Hearing Debtor's Motion For An Order Rejecting The Fishers Leases, Effective June 30, 2011
("the "Expedited Hearing Motion")**

78. The Debtor has requested that the Fishers Leases be rejected, effective June 30, 2011. See the Lease Rejection Motion. The Debtor requests that the Court hear and determine the Lease Rejection Motion on an expedited basis, before the date which the August, 2011 rent comes due. The expedited determination of the Lease Rejection Motion should minimize the expenses of the estate and is an essential first step in the efficient commencement of this Chapter 11 Case, thereby facilitating the Debtor's prompt and efficient liquidation. IMC surrendered the Fishers Building to Lantern on June 30, 2011 and requests that the rejection be effective as of the date of surrender. Expedited determination of the Lease Rejection Motion prior to July 29, 2011, including a shortened objection period, should remove any doubt with respect to any potential claim for rent before the August rent comes due.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 8th day of July, 2011 at Chicago, Illinois.

                                              */s/ Fred C. Caruso*
                                              Fred C. Caruso, Declarant
                                              President and Chief Restructuring Officer